# United States Court of Appeals
## For the First Circuit

No. 05-1454

FATMIR HOXHA; ERMIRA HOXHA; VINCENZO HOXHA; ANXHELO HOXHA,

Petitioners,

v.

ALBERTO GONZALES,
Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella and Lipez, Circuit Judges,

and DiClerico,* District Judge.

Daniel F. Cashman, with whom Cashman & Lovely, P.C. and Susanna L. Shafer were on brief, for petitioners.
H.S. García, United States Attorney, with whom Nelson Pérez-Sosa and Scott Anderson, Assistant United States Attorneys, were on brief, for respondent.

May 3, 2006

* Of the District of New Hampshire, sitting by designation.

**LIPEZ**, <u>**Circuit Judge**</u>.  We must decide whether substantial evidence supports the Board of Immigration Appeals' (BIA) affirmance without opinion of an Immigration Judge's (IJ) denial of the petitioners' application for asylum based on an adverse credibility determination.  After reviewing the testimony and documents in the record, we affirm.

## I.

On March 31, 2002, Fatmir Hoxha ("Hoxha"), his wife, Ermira Hoxha, and their two children, Vincenzo and Anxhelo Hoxha, entered the United States without proper documentation.  Several months later, on June 19, 2002, Hoxha applied for asylum and withholding of removal, and for relief under the Convention Against Torture, asserting that he and his family were persecuted on account of his membership in the Democratic Party of Albania.[1]  In support of his application, Hoxha submitted two declarations:  one dated June 2002, and the other July 2002.  In August 2002, the INS served Hoxha with a Notice to Appear, charging him with removeability under § 237(a)(1)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(A).  On September 30, 2003, after hearing testimony on the merits of Hoxha's application, the IJ denied it and entered an order of removal to Albania.  Specifically, the IJ made a negative credibility determination

---

[1] Hoxha's wife and children are derivatives listed on his asylum application.

based on discrepancies between Hoxha's two declarations, and between those declarations and his in-court testimony. The BIA issued a summary affirmance without opinion on March 28, 2003.[2] Hoxha filed this petition, claiming that the IJ's decision, affirmed by the BIA, is not supported by substantial evidence, and that the BIA violated its own regulatory procedure by streamlining Hoxha's case and affirming the IJ's decision without opinion.

## II.

We summarize the testimonial and documentary evidence that Hoxha presented to the IJ and then discuss the IJ's evaluation of that evidence.

### A.       Summary of Evidence

Hoxha was born in Tirana, the capital of Albania, where he lived for approximately thirty-five years before coming to the United States. Hoxha was self-employed as the owner of a "fast food business." In 1995, he joined the ruling Democratic Party of Albania, "participat[ing] in every rally and meeting," contributing money, and "help[ing] recruit[] young people, new people to increase the membership." The Democratic Party remained in power from March 1992 until June 1997, when the Socialist Party was elected. Hoxha's problems with the government then began.

---

[2] "Where, as here, the BIA summarily affirms the decision of the IJ, we review the decision of the IJ." Mihaylov v. Ashcroft, 379 F.3d 15, 18 n.3 (1st Cir. 2004).

-3-

On June 30, 1997, police beat Hoxha over the head with clubs while he attended a meeting in the public square protesting the Socialist Party's "manipulation of the election that took place in June." Police arrested Hoxha, forced him into a car, and continued to beat him on the way to "prison number 313." Once there, police beat Hoxha more severely, using their fists and clubs, and kicking him all over his body. Hoxha remained in custody overnight. The following day, police asked Hoxha to sign a document stating that he had participated in an illegal meeting, which he refused to do. Before releasing Hoxha, police told him not to attend any more meetings.

The following year, on March 31, 1998, a suspicious fire occurred at the home of Hoxha's father during a visit from Hoxha, his son Anxhelo, and several of Anxehlo's friends. Hoxha "heard the children screaming" and "saw flames coming out of the room." His son "had flames on his arm and another child also and my son's hands were taken afire." Hoxha took his son to the hospital, where his son remained for seventeen days.

On May 24, 1998, when Hoxha was returning from a Democratic Party rally, people in civilian clothing hit him "very hard without any warning or saying anything," leaving him unconscious on the ground where he remained for several hours. Hoxha, accompanied by his wife, sought medical treatment at the hospital for his injuries. One year later, on September 12, 1999,

-4-

police again arrested Hoxha at an "illegal meeting" of the Democratic Party. At the police station, police subjected Hoxha to "very hard heavy physical violence," including beatings "with rubber sticks and the butt of a gun." Hoxha explains that police "cut my eyebrow, all the parts of my body, they were hitting me. They tied me to the chair. They were hitting me on the legs and on the head . . . ." The police then told Hoxha that they had started the fire that injured his son, stating that "for 45 years we are in power, we are going to kill you. Like we burned your house. We are going to try to burn your house. We are going to burn you out."

On March 22, 2000, at a Democratic Party meeting in the public square celebrating "the anniversary of the victory of democracy," police arrested Hoxha and beat him in custody. Hoxha explains that police were "pulling [his] hair" and hitting him on the back, and that he "was unconscious several time[s] from the police brutality." Police held him in custody overnight and released him the following day, warning him that if they saw him at any more meetings, he "was the first one [they were] going to grab."

The following month, three men in civilian clothing approached him on the street and began beating him. They "told [him] to stop [his] political activities" and then left him on the ground. On June 5, 2000, police approached Hoxha at a Democratic

Party meeting and began punching him. According to Hoxha, "[t]wo of them were holding me. One of them was punching me in the stomach with police clubs in the back." Hoxha received medical treatment for "shock[] and [] depress[ion]."

In October of that year, Hoxha was chosen to represent the Democratic Party as a member of the commission charged with ensuring the fairness of the local mayoral elections. Hoxha began receiving anonymous and threatening phone calls and letters throughout the month, telling him that he "should pull out . . . should resign as a member of the democratic party[], [and] threats against [his] children." Immediately following the elections, on his way out of the election office, Hoxha was attacked by several people "dressed in civilian clothing," who thr[e]w [him] to the ground, hitting [him] hard, [with] heavy objects, [and] punching [him]." Hoxha sought medical treatment at the hospital for a cut on the back of his head and received several stitches.

On October 26, 2000, police approached Hoxha and his wife in the public square as they protested the manipulation of the mayoral elections. One police officer "threw [Hoxha] on the ground . . . punched [him], kicked [him] on the lip [and] punched him," while other officers hit his wife and pulled her hair. Police then handcuffed Hoxha and brought him and his wife to the police station, where they "beat[] [him] with police clubs and kicking." Hoxha was "bleeding very much," and police brought him to the

hospital, where he received stitches for the cut on his lip. He was then brought back to the police station, where police questioned him about his participation in the illegal meeting and told him "not to go to meetings anymore because they are illegal." Hoxha responded by telling the police that he would "take them to court" for beating him and his wife. The police released Hoxha and his wife after three days. Hoxha's wife "had a swollen eye. In the face, they slapped her and they were pulling her hair in the cell." After his release, Hoxha filed a complaint with the local district attorney's office, but the complaint was never prosecuted.

On January 24, 2001, Hoxha's house was hit with "heavy machine guns," which injured his son, Anxhelo, whose "left leg was bleeding." Hoxha and his wife took their son to the hospital, but were told that the hospital lacked "conditions to operate on him," and that they should instead take their son to Greece to receive treatment. Hoxha arranged for his brother, who lived in Greece, to take Anxhelo to a hospital there. Anxhelo returned from Greece over a week later, on approximately February 3 or 4. Shortly thereafter, Hoxha decided to flee Albania.

On February 8, 2001, Hoxha sold his fast food business; the following month, he and his family left Tirana for Vlora, Albania. They remained in Vlora for over a year. During that time, in December 2001, Hoxha briefly returned to Tirana to discuss obtaining passports so that he and his family could leave Albania.

While in Tirana, Hoxha attended a Democratic Party activity. During a lunch break, approximately four civilians attacked Hoxha as he sat with several friends at a coffee shop. According to Hoxha, "I fell down and I was bleeding and they said – you are the one criticizing everywhere that you are going? – You forgot something that we are back in power son of the beach [sic]." They then kicked him and beat him.

On March 30, 2002, Hoxha and his family traveled by plane to Milan, Italy, and then to Montreal, Canada, where they arrived on March 31, 2002. That same day, Hoxha and his family crossed the Canadian border into the United States using passports provided by a smuggler, took a taxi to Albany, New York, and arrived in New York City by bus.

Hoxha also submitted numerous documentary sources in support of his application, including: two membership verifications for the Democratic Party; an alleged certificate from the district attorney of Tirana stating that Hoxha and his wife were "mistreated by the police" following a demonstration on October 26, 2000; a membership card from the Association of Ex-Politically Persecuted of Albania stating that he "belonged to a persecuted family"; a medical report from the University Hospital Center of Tirana regarding the treatment of Anxhelo Hoxha for burns; an alleged newspaper article dated May 25, 2001, regarding the persecution of Hoxha and his family; and the State Department's

2002 Country Reports on Human Rights Practices for Albania, which reported that "police beat and otherwise abused suspects, detainees and prisoners," and that police "arbitrarily arrested and detained persons."

## B.        IJ's Evaluation of Evidence

The IJ denied Hoxha's request for asylum, withholding of removal, and withholding under the Convention Against Torture, based on an adverse credibility determination.[3]  In reaching this determination, the IJ recognized that "a credibility assessment is not reducible to a finite formula, and that all factors must be considered both individually and cumulatively."  While "mere trivial errors or errors incidental to a claim are insufficient for an adverse credibility finding," the IJ reasoned, "discrepancies and omissions [that] cumulatively go to the heart of the claim or otherwise show testimony ultimately dubious" support such a finding.  Where these discrepancies and omissions exist, the IJ noted, "the three prong test of [In re A-S-, 21 I & N Dec. 1106, 1109 (BIA 1998)], must also be met," that is,

> (1) the discrepancies and omissions described by the Immigration Judge must actually be present in the record;
> (2) the discrepancies and omissions must provide specific and cogent reasons to conclude that the alien provided incredible testimony; and

---

[3] According to the IJ, "[d]espite the adverse credibility finding, the Court did find th[e] portion of [Hoxha's] testimony, relative to his manner and date of arrival in the United States, to be sufficiently credible to justify considering [his] application for asylum on the merits."

(3) a convincing explanation for the discrepancies or omissions must not have been supplied by the alien.

Even where these credibility factors are present, the IJ noted that "there may be circumstances where an individual's ability to recall dates and times would be in doubt, but should not undermine the individual's credibility." These circumstances include where an individual has "suffered traumatic occurrences distant in time and in a manner that can impair his ability to provide chronologically cogent and persuasive testimony," or where an individual who "is not represented by counsel, either in the preparation of the application or in Court," is "unartful" in the presentation of his case.

The IJ determined that, in light of all of these factors, "[t]he discrepancies and omissions in this case are significant, and cause this Court to have so [sic] serious doubts about the respondent's credibility that the Court is without recourse, but to enter an adverse credibility finding." In making this determination, the IJ noted numerous inconsistencies between Hoxha's two declarations, and between those declarations and his in-court testimony. Hoxha's first declaration does not reference the March 31, 1998 fire that injured his son, and the second declaration states that the fire occurred on March 3, not March 31, 1998. Neither declaration mentions that during the September 12, 1999 incident, police admitted to setting the fire. While Hoxha's

-10-

testimony and second declaration both refer to his being beaten following the mayoral elections in October 2000, Hoxha's first declaration states that the elections took place one year later in October 2001. In addition, neither declaration mentions the October 26, 2000 incident in which police beat and detained Hoxha and his wife.

The IJ found "very significant . . . the fact that the respondent was unequivocal that he says that he sold his business on February 8, 2001, while both declarations indicate that the respondent's business was sold by him in August of 2000." The IJ also noted the "drastically different" reasons that Hoxha gave for selling his business: Hoxha testified that he sold his business shortly after his son was injured by heavy artillery and was sent to Greece for treatment, while "in both declarations, the respondent stated that the business was sold after they were constantly being threatened by the secret service." The IJ also found "very significant" the discrepancy surrounding the date on which Hoxha's son returned from Greece after receiving medical treatment. According to the IJ, "[t]he respondent was clear that his son returned from Greece in early February perhaps February 4, 2001, while both declarations state that his son returned on March 4, 2001." Lastly, the IJ notes that unlike his second declaration and testimony, Hoxha's first declaration does not mention the

-11-

December 2001 incident in which he was attacked by several civilians upon returning to Tirana.

The IJ stated that he was also troubled by the fact that Hoxha's attorney knew of only one of the two declarations submitted by Hoxha and thus knew nothing of the inconsistencies between the two. By failing to address these inconsistencies in a supplemental or amended application prior to the hearing before the IJ, Hoxha's attorney "effectively ratified one or both declarations that existed in this record." In addition, while Hoxha claimed that he went over his application with his attorney, neither Hoxha nor his attorney seemed to know of the inconsistencies between the declarations and the testimony that Hoxha planned to give at the hearing before the IJ. As a result, the IJ noted, Hoxha made no attempt at the hearing to address the inconsistencies between his two declarations and between the declarations and his testimony.

Based on this evidence, the IJ determined that he could not enter a favorable credibility finding. "[D]espite the existence of documentation in the record that on its face seems to verify much of what the respondent has claimed happened," the IJ stated that the documents proffered by Hoxha were "not authenticated and their mere existence is insufficient to overcome the adverse credibility finding . . . ." In addition, the IJ noted that Hoxha did not attempt to rehabilitate his credibility by providing corroborating evidence, such as documentation of his

son's medical treatment in Greece or his own medical treatment in Tirana. "If credible," the IJ noted,

> there is certainly nothing inherently implausible about the respondent's claim, given the now evolving conditions in Albania. However, on this record, the Court finds that the respondent has not met his burden of proof and persuasion, in that he has not presented an adequately credible claim in light of the content of his testimony and the discrepancies that exist both between his testimony and the declarations, as well as to each declaration itself.

## III.

### A.        Standard of Review and Burden of Proof

We review the IJ's factual findings and credibility determinations "under the deferential substantial evidence standard." Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005). "The IJ's determination must stand 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Id. (quoting 8 U.S.C. § 1252(b)(4)(B)). We will give great deference to an IJ's credibility determinations "so long as the IJ provides specific reasons for those determinations." Id. (internal citation and quotation marks omitted). "[W]e will remand if the agency fails to state with sufficient particularity and clarity the reasons for denial of asylum or otherwise to offer legally sufficient reasons for its decision." Mihaylov, 379 F.3d at 21 (internal citation and quotation marks omitted); see also Cordero-Trojo v. INS, 40 F.3d 482, 487 (1st Cir. 1994) ("[D]eference is not due where findings and conclusions are based on inferences or

-13-

presumptions that are not reasonably grounded in the record, viewed as a whole, or are merely personal views of the immigration judge."). When a case "rises and falls purely on an IJ's credibility finding," it is particularly important that the decision-maker "carefully detail the reasoning leading to the adverse finding." Secaida-Rosales v. INS, 331 F.3d 297, 307 (2d Cir. 2003).

The burden of proof is on the asylum applicant to demonstrate that he or she meets the statutory definition of a refugee and is therefore eligible for asylum. See 8 C.F.R. § 1208.13(a). "The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution [on account of race, religion, nationality, membership in a particular social group, or political opinion]." 8 C.F.R. § 1208.13(b). "An applicant's testimony, 'if credible, may be sufficient to sustain the burden of proof without corroboration.'" Dhima, 416 F.3d at 95 (quoting 8 C.F.R. § 1208.13(a)). "[I]f the applicant is found not to be entirely credible, corroborating evidence may be used to bolster an applicant's credibility." Id. (internal citation and quotation marks omitted).[4]

_____

[4] The REAL ID Act of 2005, Pub. L. 109-113, 119 Stat. 302, "alters, among other things, the standards governing credibility determinations and the need for corroboration of testimony in asylum cases." Dhima, 416 F.3d at 95 n.3. Because these provisions apply only to "applications for asylum, withholding or other relief from removal made on or after [May 11, 2005]," REAL ID

-14-

**B.       Adverse Credibility Determination**

The IJ determined that Hoxha was not credible based on numerous inconsistencies between Hoxha's two declarations, and between those declarations and Hoxha's testimony at the hearing. Relying upon the BIA's three-prong test for evaluating credibility set forth in In re A-S-, the IJ found (1) discrepancies and inconsistencies in the record (2) which provided specific, cogent reasons for an adverse credibility determination, and (3) which were not adequately explained by Hoxha.

**1.       Discrepancies and Inconsistencies in Record**

Hoxha does not take issue with the IJ's findings regarding the first prong of this test; he concedes that there are inconsistencies between the June 2002 and July 2002 declarations, and between those declarations and his testimony at the hearing before the IJ.

**2.       Specific, Cogent Reasons**

Hoxha argues that, for a variety of reasons, the inconsistencies in this case do not provide cogent reasons for an adverse credibility determination.

---

ACT § 101(h)(2), these provisions are not applicable to this case.

a.    Heart of the Asylum Claim

Hoxha first argues that the inconsistencies cited by the IJ do not undermine Hoxha's credibility because they are "minor" and "do not go to the heart of the applicant's asylum claim."  We have stated that "an adverse credibility determination cannot rest on trivia but must be based on discrepancies that involved the heart of the asylum claim." Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999) (internal citation and quotation marks omitted); see also Secaida-Rosales, 331 F.3d at 308 (stating that "[i]nconsistencies of less than substantial importance for which a plausible explanation is offered cannot form the sole basis for an adverse credibility finding. . . . especially [] when the inconsistencies do not concern the basis for the claim of asylum or withholding, but rather matters collateral or ancillary to the claim" (internal citations and quotation marks omitted)); Shah v. INS, 220 F.3d 1062, 1068 (9th Cir. 2000) ("Minor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." (internal quotation marks and citation omitted)).

The heart of Hoxha's claim of asylum is that he and his family were persecuted on account of his political activity with the Democratic Party of Albania.  The numerous inconsistencies between Hoxha's two declarations, and between the declarations and

Hoxha's sworn testimony, closely relate to this alleged persecution. These inconsistencies include: discrepancies surrounding the date on which police set fire to Hoxha's home and omissions concerning whether police admitted setting the fire; discrepancies surrounding the year in which Hoxha was beaten following his participation in the mayoral elections; omissions concerning whether Hoxha and his wife were beaten and detained by police in October 2000; discrepancies surrounding the year in which Hoxha sold his business and his reasons for selling it; discrepancies surrounding the date on which Hoxha's son returned from the hospital after being injured by artillery fired at Hoxha's home; and omissions concerning whether Hoxha was beaten by civilians after briefly returning to Tirana in December 2001.

Far from trivial, the numerous inconsistencies cited by the IJ involve the heart of Hoxha's asylum claim and thus support the IJ's adverse credibility finding. Compare Bojorques-Villanueva, 194 F.3d at 17 (holding that the BIA's adverse credibility finding was supported by substantial evidence where "the inconsistencies noted by the Board were more than several and more than minor, such as an error in dates or typographical error" and "the multiple inconsistencies went to the central facts," i.e., "the where, the who, the when and the what" of the triggering event), and In re A-S-, 21 I & N Dec. at 1110 (holding that "the omission of key events [] coupled with numerous [date]

-17-

inconsistencies," was a "specific and cogent reason supporting the [IJ]'s adverse credibility finding"), with Vilorio-Lopez v. INS, 852 F.2d 1137, 1142 (9th Cir. 1988) ("Minor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding."), and Martinez-Sanchez v. INS, 794 F.2d 1396, 1400 (9th Cir. 1986) (holding that two "trivial errors" in an otherwise consistent record "did not constitute a valid ground upon which to base a finding that an asylum applicant is not credible").

### b. Legitimate Nexus

Hoxha further argues that "even assuming that some of the discrepancies contained in the written statements involved matters central to [his] asylum claim," these discrepancies bear no "legitimate nexus" to the IJ's adverse credibility finding. "A reasonable factfinder upon review of the entire record," Hoxha contends, "would be compelled to conclude that the discrepancies in the statements indicated not negative credibility, but sloppy and irresponsible lawyering."

In support of this argument, Hoxha notes that both declarations were "written in broken English replete with grammatical and spelling errors, typos, and long passages of boilerplate legal language unrelated to [his] specific asylum claim." Many of the discrepancies in dates, Hoxha argues, "seem

indicative of typographical errors rather than lack of credibility," such as where the June 2002 declaration erroneously states that the fire at the home of Hoxha's father started on "March 3, 1998" instead of on March 31, 1998. Hoxha also contends that he was wholly unprepared for questioning regarding the inconsistencies between his first and second declarations, and between those declarations and his testimony, because his lawyer did not review the declarations with him prior to the hearing before the IJ. Hoxha supports this contention by noting that he did not sign either declaration; both declarations are in English, which he could not read; and neither he nor his attorney were aware of the existence of a second declaration.

An IJ's reasons for rejecting an applicant's testimony on credibility grounds must "bear a legitimate nexus" to the adverse credibility finding. Secaida, 331 F.3d at 307. We find such a nexus here. While the contents of Hoxha's declarations and his preparedness for the hearing before the IJ leave much to be desired, these deficiencies do not compel a finding that Hoxha was poorly represented but credible. On the contrary, the record supports the IJ's determination that the inconsistencies in this case were so significant that the IJ was "without recourse [] but to enter an adverse credibility finding."

Even if "sloppy drafting" were to blame for the discrepancy in the date of the fire that injured his son, Hoxha

-19-

does not explain how poor drafting resulted in discrepancies in the month and even the year of certain other events, and in the omission of some events altogether. In addition, while the record reflects that Hoxha had difficulty understanding English (he had an interpreter at his hearing before the IJ, and he testified that an interpreter filled out his application based on answers that he, via his cousin, provided in Albanian); that he did not technically sign either declaration (his name is typewritten at the end of both declarations); and that his attorney was unaware of the existence of one of the two declarations, Hoxha twice acknowledged explicitly that he knew of the two declarations. He also answered in the affirmative when asked by both the IJ and the government whether he had reviewed his asylum application with his attorney. The record thus supports the IJ's determination that the inconsistencies in this case pointed not to poor representation, but rather to a lack of credibility.

c.  Other Measures of Credibility

Even if the inconsistencies in this case support an adverse credibility determination, Hoxha argues that "consistency between written and oral statements is [only] one measure of credibility. A reasonable factfinder could have evaluated [him] on the plausibility of his story, his level of detail, [and] his demeanor when testifying." The IJ did consider other measures of credibility before rendering the adverse credibility determination.

At the outset of his analysis, the IJ stated that he "had the opportunity to observe the respondent's demeanor throughout his testimony and to compare that testimony to the written application and supporting documentation." The IJ also acknowledged "the existence of documentation in the record that on its face seems to verify much of what the respondent has claimed happened," but noted that the documents were not authenticated and that "their mere existence is insufficient to overcome the adverse credibility finding." While Hoxha "could have attempted to rehabilitate his credibility" by coming forward with other corroborating evidence, the IJ noted, he did not do so. In addition, the IJ acknowledged the plausibility of Hoxha's story, stating that "[i]f credible, there is certainly nothing inherently implausible about the respondent's claim, given the now evolving conditions in Albania."

Viewing the record as a whole, the IJ determined that the existence of corroborating evidence, together with the plausibility of Hoxha's claim, were insufficient to overcome the IJ's "serious doubts" about Hoxha's credibility. Given the "significant" discrepancies and omissions identified by the IJ in this case, the IJ did not err in finding that the evidence supported an adverse credibility determination.

This case is therefore different from Osorio v. INS, 99 F.3d 928 (9th Cir. 1996), cited by Hoxha, in which the Ninth Circuit remanded the BIA's denial of asylum in a case involving

-21-

inconsistent declarations. In that case, neither the IJ, nor the BIA, which adopted the IJ's reasoning, "identif[ied] the specific inconsistencies on which they based their finding that [the applicant] was not credible," nor did they give "any indication of the nature or gravity of the inconsistencies that they purported to rely upon." Id. at 931-32. Rather, the IJ merely stated that the petitioner was "not credible" based on "inconsistencies" stemming from a "garbled and difficult to understand" application, which, the Osorio court noted, was "clear[ly]" not drafted by someone fluent in English. Id. at 929, 931. There was no indication, the court stated, that either the BIA or the IJ evaluated whether the inconsistencies in the applicant's first application "may have been simply the product of a language barrier or of a misreading of a largely unintelligible document." Id. at 932.

In this case, by contrast, the IJ listed the numerous "significant" and "troubling" inconsistencies upon which it relied for its adverse credibility determination. Unlike Osorio, the IJ also acknowledged that "there may be circumstances where an individual's ability to recall dates and times would be in doubt, but should not undermine the individual's credibility," such as "when an individual is not represented by counsel, either in the preparation of the application or in Court." Here, the IJ noted, Hoxha was not only represented by counsel but also testified that he had reviewed his asylum application with his attorney prior to

the hearing. Lastly, while the declarations in this case were replete with various grammatical and spelling errors, they were by no means unintelligible. Therefore, the inconsistencies relied upon by the IJ, unlike those in Osorio, were not "illusory," i.e., they were not "simply the product of a language barrier or of a misreading of a largely unintelligible document." 99 F.3d at 932.

3. Convincing Explanation of Discrepancies or Omissions

Hoxha argues that he provided reasonable explanations for the various inconsistencies at the hearing before the IJ, and, therefore, the IJ's adverse credibility determination is not supported by substantial evidence. Hoxha's argument is unavailing. When asked by the IJ why his two declarations listed different dates for the March 1998 fire at his father's home, Hoxha answered that "[m]aybe it was a mistake." When asked by the government why he did not mention the September 1999 admission by police to burning his father's home, Hoxha offered no explanation at all. He also failed to give an explanation for why the date that he testified he sold his store differed from the date provided in his declarations by almost a year. When the IJ asked Hoxha why he did not amend or correct his asylum application to clarify the inconsistencies between his application and his testimony regarding the date on which his son returned from the hospital in Greece, Hoxha stated only that he was telling the truth, and that his testimony was correct. As the IJ states, not only did Hoxha not

-23-

address these discrepancies, "but [he] seemed to not even know they existed" – despite having reviewed his application with his attorney. The record therefore supports the IJ's determination that Hoxha did not convincingly explain the inconsistencies in his case.

## C.        Summary Affirmance

Hoxha argues that in affirming the IJ's decision without opinion, the BIA violated its summary affirmance procedure. Under this procedure,

> [t]he Board member to whom a case is assigned shall affirm the decision of the Service or the immigration judge, without opinion, if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that
>
> (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or
>
> (B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

8 C.F.R. § 1003.1(e)(4)(i).

Hoxha argues that the BIA erred because its decision "was based upon an incorrect result reached by the IJ, and upon the IJ's erroneous conclusions of law and fact that were neither harmless nor nonmaterial."[5] The government, on the other hand, argues that

---

[5] Hoxha does not argue that the issues on appeal in this case are not controlled by existing precedent or that they involve the application of precedent to a novel fact situation, nor does he

-24-

the BIA's decision to streamline a particular case is not subject to judicial review because the streamlining procedure is an action committed to the absolute discretion of the BIA.

We have previously acknowledged that we have jurisdiction to review the BIA's decision to streamline, at least in those cases involving both a reviewable and non-reviewable basis for the IJ's decision, where it is unclear on what basis the BIA summarily affirmed the decision. See Haoud v. Ashcroft, 350 F.3d 201, 206 (1st Cir. 2003) ("Especially when the Board's review of an IJ's decision often hinges on Circuit court precedent, we are well-equipped, both statutorily and practically, to review a decision to streamline."). Here, however, "it makes no practical difference whether the BIA properly or improperly streamlined review" since "we can review directly the decision of the IJ." Olowo v. Ashcroft, 368 F.3d 692, 698 (7th Cir. 2004) (internal quotation marks and citation omitted); see also Falcon Carriche v. Ashcroft, 350 F.3d 845, 854 n.7 (9th Cir. 2003) (stating that in most cases, "streamlining and the merits issues collapse into one analysis and thus the issues surrounding jurisdiction over streamlining, however decided, [do] not prevent review on the merits"). Because we find the IJ's adverse credibility determination clearly supported by substantial evidence in the record, we dispose of Hoxha's argument without reaching whether the

argue that the factual and legal questions raised in his case are so substantial as to warrant issuance of a written opinion.

BIA's affirmance of the IJ's adverse credibility determination under the summary affirmance procedure was error.

## IV.

The BIA's order is **affirmed**; the petition for review is **denied**.

**So ordered**.