CYR, Senior Circuit Judge
(dissenting).
Because the majority seriously misreads the appellate record, and particularly the agency’s two written decisions, I respectfully dissent. In deferring wholesale to the agency’s credibility determinations in these circumstances, the majority turns our review function into a hollow exercise in rubber-stamping.
I.
In assessing pivotal credibility determinations, we must — at the very least — hold the agency to its word. If the BIA had merely affirmed and adopted the IJ’s decision without further elaboration, we would review the IJ’s rationales directly and exclusively. Importantly, however, that is not what the BIA’s decision purported to do; it added its own gloss. The BIA expressly did not “affirm” — but instead rejected — the IJ’s decision that the discrepancies concerning how Cuko smuggled his wife and child into the United States could be weighed in assessing his credibility: “[W]e agree with the applicant that the inconsistencies in the record concerning how much he paid to have his wife and son smuggled into the United States are collateral to his asylum claim.” (Emphasis added.) The majority’s insistence to the contrary is directly at odds with this plain language.
Further, although the BIA is not required to catalog every basis for affirming an IJ’s credibility decision, and indeed could have simply affirmed the IJ’s remaining rationales without comment, the BIA in this case expressly stated that it had found “sufficient other evidence in the record to support the [IJ’s] credibility finding.” See Sou v. Gonzales, 450 F.3d 1, 7 (1st Cir.2006) (“In our review, we consider only the reasons stated by the Board for denying relief and do not independently consider whether other grounds would be supported by the record.”). If the BIA had proceeded merely to give an example of this “other evidence,” one reasonably might argue that it implicitly was affirming all of the IJ’s remaining rationales. Rather than begin the next sentence with the phrase “For example,” however, the BIA begins with “Specifically,” which connotes that it intends to identify the “other evidence” that independently supports its affirmance. See Tobon-Marin v. Muka-sey, 512 F.3d 28, 30 (1st Cir.2008) (“As the BIA adopted and supplemented the IJ’s opinion with its own substantive gloss, we evaluate both the IJ’s decision and the BIA decisions.”); Xue Hong Yang v. United States Dep’t of Justice, 426 F.3d 520, 522 (2d Cir.2005) (noting that when the BIA affirms the IJ’s decision in all respects but one, the appellate court must review the IJ’s decision as modified by the BIA decision, “minus the single argument for denying relief that was rejected by the BIA”). Given this choice of language, we must ask whether the specific evidence cited as a ground for affir-mance — that the party certificate per se contradicts Cuko’s testimony that he re *42 mained an “active” and “recognized” party member in February and March 2001— meets the three-part appellate review standard (viz., the presence of an actual discrepancy which generates specific reasons to suspect the applicant’s veracity, and for which he has provided no persuasive explanation). See Hoxha v. Gonzales, 446 F.3d 210, 214 (1st Cir.2006); In re A-S- 21 I. & N. Dec. 1106, 1109 (BIA 1998).
The majority mistakenly suggests that even this narrower BIA determination is itself a sufficient ground to deny Cuko’s petition for review. The putative discrepancy- — the Party certificate’s necessary implication that Cuko thereafter became “inactive” in his party activities — is simply not a self-evident inconsistency. An asylum applicant might testify, for example, that he entered the country from Canada, then testify later that he entered the country from Mexico. In that case of facial inconsistency (viz., both versions of the historical facts cannot be simultaneously true), we would be hard-pressed to find that the IJ could not rely on that unexplained inconsistency in finding the applicant not worthy of credence.
By contrast, the Party certificate suggests only that Cuko, a long-time party member, stopped paying his dues in November 2000. When specifically asked to explain why he had stopped paying his dues, he testified that he had planned unsuccessfully to relocate to Tirana to escape increased political persecution. He later testified, however, that he remained “active” in the Party after November 2000, and continued to be “recognized” as an active party member and organizer. Unlike the black-and-white Canada-Mexico discrepancy hypothesized above, however, the perceived discrepancy between the concepts “non-dues-paying” and “active” is hardly inexorable. See San Kai Kwok v. Gonzales, 455 F.Sd 766, 769 (7th Cir.2006) (“ ‘[Ajdverse credibility determinations should not be grounded in ... easily explained discrepancies’ because such bases lack the necessary ‘legitimate nexus to the finding.’”) (citation omitted); Ming Shi Xue v. BIA, 439 F.3d 111, 114-115 (2d Cir.2006) (“[W]hen an inconsistency is not self-evident, an IJ may not rely on it to support a credibility determination without first bringing the perceived discrepancy to the alien’s attention, thereby giving the alien an opportunity to address and perhaps reconcile the seeming inconsistency, to the IJ’s satisfaction, at the least.”); accord He Chun Chen v. Ashcroft, 376 F.3d 215, 224 (3d Cir.2004) (“[AJmbiguous answers at airport interviews should not be relied upon to question the credibility of the alien .... ”). The adjective “active” obviously requires some further definition and explanation, and in this instance, the IJ did not point out the perceived inconsistency to Cuko at the hearing, nor did he allow Cuko a reasonable opportunity to explain why or how the two items of evidence were not discrepant. Under the first criterion of the Hoxha standard of review, there simply is no actual discrepancy. See, e.g., Bandari v. INS, 227 F.3d 1160, 1167 (9th Cir.2000) (finding no actual inconsistency between two statement that IJ perceived as discrepant).
The certificate proves, at most, that Cuko’s official membership in the party terminated when he ceased paying dues in November 2001, as Cuko freely admitted. The IJ neither sought out nor received any evidence, however, that Democratic Party rules forbade persons, whose official party membership had lapsed, from continuing to participate in or to organize party election rallies, and/or that the party actively monitored such participants to ensure that their formal party membership had not expired. Nor was Cuko ever asked to explain the perceived inconsistency. Hox-ha, 446 F.3d at 214 (noting that petitioner *43 must have failed to provide a persuasive explanation for the purported discrepancies). During the period from November 2000 to March 2001, Cuko purportedly was planning a move to Tirana, but reasonably may have decided to participate in local party election activities pending that relocation.
More importantly, even if evidence had been presented to the effect that the Party forbade its expired members from taking part in any further party activities and events, Cuko testified that, due to his longstanding and high-profile affiliation with the Democratic Party, most people in town still would “recognize” him as a party member, whether or not his official membership had terminated. Indeed, it is unlikely that the Democratic Party’s political opponents — for example, according to Cuko, the police — would be privy to internal party documentation attesting to the termination of Cuko’s official membership. An asylum claim can be predicated not only on an applicant’s actual political opinion or affiliation, but on his perceived affiliation with a particular political opinion. See Mekhoukh v. Ashcroft, 358 F.3d 118, 124 (1st Cir.2004); see also Koudriachova v. Gonzales, 490 F.3d 255, 264 (2d Cir.2007) (“We explained that the relevant question is not whether an asylum applicant subjectively holds a particular political view, but instead whether the authorities in the applicant’s home country perceive him to hold a political opinion and would persecute him on that basis.”); Chun Gao v. Gonzales, 424 F.3d 122, 129 (2d Cir.2005) (“ ‘[A]n imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground of political persecution within the meaning of the Immigration and Nationality Act.’ ”) (quoting Alvarez-Flores v. INS, 909 F.2d 1, 4 (1st Cir.1990)).
By denying Cuko’s petition for review on this basis, the majority essentially condones and rubber-stamps an undesirable policy and practice: an IJ silently may collect what he perceives as testimonial discrepancies of a latent kind which would not be readily apparent to the asylum applicant or his counsel, offer the applicant no contemporaneous opportunity to explain why his perception is faulty, and then blindside the applicant after the fact with an asylum decision premised entirely on his untested adverse credibility findings. This practice is not only at odds with our clear precedent, but would subvert the essential truth-seeking function of asylum proceedings.
II.
Even if my interpretation of the BIA decision were arguable, and we were permitted to review the IJ’s other rationales for the adverse credibility determination, the other discrepancies identified by the IJ are not objectively supportable grounds for his adverse credibility finding.
A. Cuko’s Chain of Custody Testimony
With respect to the alleged discrepancy in Cuko’s accounts as to how he obtained his Democratic Party membership card as a hearing exhibit, the inconsistency in his accounts is self-evident, and the IJ afforded Cuko adequate opportunity to explain them.
That said, the BIA’s refusal to mention the IJ’s chain-of-custody rationale as a ground for its affirmance is not surprising. When an IJ bases an adverse credibility determination on alleged testimonial discrepancies, he or she must be especially “ ‘sensitive to the complexities of receiving testimony through a translator,’ ” and the possibility “that the alleged discrepancy resulted from confusion, and not an attempt at fabrication.” Heng v. Gonzales, *44 493 F.3d 46, 49 (1st Cir.2007) (citing Giday v. Gonzales, 434 F.3d 543, 549 n. 2 (7th Cir.2006)). When the IJ asked Cuko to explain why he first testified that his father-in-law had obtained the membership card from the party archives after Cuko arrived in the United States, Cuko stated that he had been “confused,” since other documents comprising Exhibit 5 were so obtained, but then he had recalled that it was not necessary for his father-in-law to get the card from the archives because Cuko already had the card in his possession before he left Albania.
A close review of the record amply supports the plausibility of Cuko’s explanation. The crux of this inquiry was whether Cuko was a Democratic Party supporter, and the fact that the Party issued this card would tend to prove that fact. The particulars of whether Cuko’s father-in-law retrieved the card directly from the Party archives, from Cuko’s home, or from Cuko himself, are not particularly important to that core inquiry. Moreover, even the attorneys experienced considerable confusion over this line of questioning, and expressed doubts whether Cuko had even been shown the correct hearing exhibits during his previous testimony. Rather than take steps to insure that Cuko’s explanation was not bona fide, however, the IJ simply forged ahead. If even attorneys proficient in English were so befuddled, we can hardly have great confidence that Cuko was not. Id.
B. Party Certificate
Tellingly, the BIA affirmed solely on the IJ’s rationale that the Party certificate’s declaration that Cuko stopped paying party dues in November 2000 was inconsistent with his testimony that he remained “active” in party activities thereafter. Its silence as to the IJ’s two other sub-rationales based on the Party certificate speaks volumes. The Cuko explanation for stopping his payment of dues — that he unsuccessfully contemplated a relocation to Tirana to avoid increased political persecution during the upcoming election season — is not inherently implausible. The record also contains no affirmative evidence tending to show Cuko’s explanation was a mere fabrication.
By the same token, the IJ’s assertion that one reasonably should expect that this type of Party certificate would contain a detailed narrative of Cuko’s history with the Party, and especially of the specific acts of political persecution allegedly inflicted on him in early 2001, is rank speculation. The terse certificate purported only to be a ministerial verification of Cuko’s official enrollment dates in the party. It indicated that it was issued at Cuko’s request {viz., to verify that he was affiliated with the Party), which means that it likely would confine its subject matter to the specific and narrow question that Cuko’s application posed. Again, the record contains no evidence that these certificates typically would contain an exhaustive or individualized history of the applicant’s activities with the party. Accordingly, the BIA made nary a mention of these dubious IJ findings.

C. Other Concerns

Cuko aptly notes that the IJ also purported to base his adverse credibility decision, in part, on “material inconsistencies and discrepancies between the applicant’s written asylum application and his testimony,” but then failed in the remainder of his decision to cite any specific examples of such variances. Instead, the IJ based his entire credibility decision on the three core discrepancies discussed above, and the BIA relied on only one inconsistency. To the extent that the Cuko asylum application suggests that he remained active in *45 Democratic Party causes and activities after the formal termination of his party membership in November 2000, however, that allegation is coterminous with the substance of his hearing testimony in this regard, and is not at “variance” with his asylum application.
If that were all the IJ meant by his reference to “discrepancies between the applicant’s written asylum application and his testimony,” it would seem that no prejudice would result to Cuko. Yet we are left with no reliable guidance as to whether the IJ relied on other purported “variances” which are neither disclosed nor described in his decision. This unilluminated reference inevitably undercuts overall confidence in the reliability of the IJ’s credibility determination.

D. Fear of Future Persecution

Although the majority correctly concludes that the country reports might have supported the IJ’s independent decision anent Cuko’s lack of a well-founded fear of future persecution, the IJ did not rely solely on these reports. Rather, he explicitly states: “Even if this court were to take other sections of the State Department report and responses in this record of proceedings to contradict that Profile, this Court must note that the applicant has been found to be not a credible witness, and therefore, this Court cannot find that his testimony or the documents that he has submitted are credible.” Because the IJ’s defective credibility determination fatally infected his decision concerning the issue of future persecution, we cannot affirm on that independent ground.
III.
Finally, from a broader policy perspective, I would suggest that this case is a prime example of what is so defective with many immigration proceedings. While the IJ reasonably might have accepted Cuko’s credibility arguendo, and then denied his asylum application either on the ground that his ill treatment did not rise to the level of “persecution,” or that the country reports refuted his fear of any future persecution (indeed, we have affirmed many IJ opinions to the effect that country conditions in Albania have changed significantly), the IJ deliberately chose silently to collect a catalog of perceived testimonial discrepancies during the hearing, and then base his final decision solely on Cuko’s lack of credibility. This may seem a relatively insignificant and academic distinction, but to an asylum applicant, it likely affects his sense that he has been given a fair opportunity to state his case for asylum. He is removed to his home country simply because he is a liar, and not because he has not proven past persecution or a well-founded fear of future persecution. Whether or not we agree about the specific facts of the present case, I think it is incumbent on us to demand from the agency a minimum threshold of fairness in the process. Expecting that the IJ will afford an applicant a fair chance contemporaneously to explain perceived discrepancies upon which the IJ intends to base his adverse credibility determination is just such a de minimis requirement. Zi Lin Chen v. Ashcroft, 362 F.3d 611, 618 (9th Cir.2004). Short of that, our review function becomes essentially meaningless.