# United States Court of Appeals
## For the First Circuit

No. 05-1668

ROS SOU AND CHANTHA SREY,

Petitioners,

v.

ALBERTO R. GONZALES, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya and Lipez, Circuit Judges,
and Saylor,[*] District Judge.

Thomas Stylianos, Jr., on brief for petitioners.
Michael J. Sullivan, United States Attorney (District of Massachusetts) and Michael Sady, Assistant United States Attorney (District of Massachusetts), on brief for respondent.

June 7, 2006

_____

[*]Of the District of Massachusetts, sitting by designation.

**SAYLOR, District Judge**. Petitioners Ros Sou and Chantha Srey seek review of a final order of the Board of Immigration Appeals affirming a denial of their application for asylum, withholding of removal on the basis of political opinion and membership in a particular social group, and withholding of removal under the Convention Against Torture ("CAT"). Finding no error, we affirm.

## I. BACKGROUND[1]

Sou and Srey are citizens of Cambodia who presently reside in Massachusetts. They were married in a Communist forced-labor camp in 1978. After working in various capacities for a number of years, they established and operated a drug store out of their home in Phnom Penh. Srey was a trained pharmacist; Sou, who described himself as "a businessman," attended to sales and other business aspects of the store.

### A. Events of May and June 2002

Petitioners' decision to leave Cambodia for the United States arose from events occurring in May and June 2002. A government worker named Ly came to Sou and Srey in early May and warned them that Sou was believed (1) to be a member of Khmer Seri

---

[1] Our review is of the Board's decision, which assumed the credibility of petitioners (notwithstanding the Immigration Judge's finding that petitioners' story was not credible). The court also assumes petitioners' credibility and recites the facts as they were represented in the petition and at the hearing. See Xu v. Gonzales, 424 F.3d 45, 46 (1st Cir. 2005).

or the Cambodian Freedom Fighters ("CFF")[2] and associated with a man named Nou Uth Buntha; (2) to be a supporter of the Sam Rainsy Party ("SRP"); and (3) to have been a soldier in the 1970s in the army of the Lon Nol government and, as a result, to be "especially dangerous."[3] Ly warned Sou that it would be safer if he went away for a while. Although Ly's statements made them fearful, petitioners did not leave the country at that time. Instead, they decided that Sou should go into hiding at his sister's home about 50 kilometers away.

Srey testified that several days later uniformed police arrived at her store in the afternoon and told her that they were looking for her husband. In the presence of customers, they held a gun to her chest and repeatedly demanded to know where he was. She said that she did not know, and they left. About two or three weeks later, after the "situation calm[ed] down," she sent a message to Sou telling him about the situation at home. After he returned home, they decided to leave Cambodia.

They spent several weeks preparing to leave the country, including obtaining a passport for Srey and visas from the U.S. Embassy. They sold off the inventory of their pharmacy and, on

_____

[2] According to the petition, the CFF is also known as Khmer Seri (variably spelled as "Serei," "Srei," and "Sari").

[3] Sou changed his name and birth date after the Khmer Rouge came to power in 1975 to mask his identity and prior military service.

June 25, 2002, closed the store.[4]  They left Cambodia two days later.  A Cambodian government official stamped Sou's passport with an exit visa, dated June 27.  When questioned as to how he obtained the stamp, Sou explained that he gave his passport to someone else to get it stamped for him.  Neither Sou, Srey, nor the individual who obtained the exit visa for Sou were questioned or detained.  They boarded their flight apparently without incident and the next day, June 28, arrived in Los Angeles.

Petitioners did not bring their children, who were then 14, 15, and 16 years old, with them.  The children were left in the care of a relative in Phnom Penh.  They receive letters from their children, but do not speak with them on the phone.[5]

B.  **Evidence of Involvement with Organizations in Cambodia**

The Board found, among other things, that petitioners had no "political affiliations of their own."  Both Sou and Srey testified that they were never members of any organization while they were in Cambodia.  However, there is evidence that they had at least tangential association with three organizations.

---

[4] Srey testified that she, not Sou, sold the inventory, and that Sou remained in hiding even though he had returned home.

[5] Both petitioners testified that their children wrote to them that the police continue to look for Sou at his home.  Srey testified that her children have told her that "these things happen every day."  The record does not contain copies of any letters from their children.

-4-

First, Sou testified that he joined the army in 1971 to fight against the Communists in support of the government then in power, which was led by Lon Nol. His involvement in the army ended when the Khmer Rouge seized power in 1975. He believes that those who fought against the Communists are viewed by the current government as opponents who are especially dangerous when they engage in political activity. Sou stated in his application that he fears arrest, disappearance, and death as a result of his former military involvement.

Second, Sou testified that he was a close friend of a man named Nou Uth Buntha, who the government would later charge and convict as a "terrorist." Sou met Buntha through a neighbor in 1996 and they became close friends. He and his wife regularly socialized with him and, for some period of time, Buntha visited their home once or twice a month. Their conversations sometimes turned to politics, and Sou knew that Buntha was a member of a political party that was, at least for some period of time, opposed to the ruling party. Sou did not know, one way or the other, whether Buntha was a member of the CFF.

In December 2000, Sou learned from a Cambodian newspaper that Buntha had been arrested for being a part of an attempt by the CFF to overthrow the government.[6] He was convicted and apparently

_____

[6] Sou believes that the government also charged Buntha with being a member of the CFF.

-5-

sentenced to a prison term of 20 years.[7] After learning of the arrest, Sou became worried that he would be arrested, and destroyed all pictures and letters in his possession that would link him to Buntha. Sou testified that, as far as he knows, Buntha was never released, was not given a fair trial, and probably was killed by the government. Sou also testified that he has never been a member of the CFF or participated in its activities. However, he testified that he fears that the Cambodian government has imputed or will impute the political beliefs of Buntha or the CFF to him because of their friendship, and that the government will cause him to be arrested, imprisoned without trial, or killed.

Third, Sou testified that, by 1998, he had become interested in the SRP. He conceded that he was not a member of the SRP and "was never active in [SRP] activities" while in Cambodia, although he had donated "some money and medicine" to the party. There is no evidence as to when he made this donation, or in what amount. Sou became a member of the SRP sometime after he left Cambodia.[8] According to background information in the record,

---

[7] Background information submitted by petitioners states that the Cambodian government has outlawed the CFF as a terrorist organization and has charged and convicted some of its members of terrorism and other crimes. The information includes allegations that some CFF supporters have been unfairly detained, charged, and convicted. Respondent has not contested the accuracy of any of this background information.

[8] Sou had apparently become a member of the SRP by the time he submitted his application for asylum. Sou submitted supplemental evidence to the Board that post-dates the Immigration Judge's

-6-

there have been documented cases of government abuses directed toward SRP activists and candidates, including harassment, threats of death and of loss of citizenship documents, and the withholding of routine services. Some SRP activists have been killed under suspicious circumstances. Sou believes that SRP supporters are at risk generally for arrest, detention, and death.

## C. **Prior Proceedings**

The former Immigration and Naturalization Service brought removal proceedings against petitioners and issued Notices to Appear on February 27, 2003. Petitioners admitted the truth of the factual allegations in the Notices, conceded removability, and sought the opportunity to apply for political asylum, withholding of removal, and withholding of removal pursuant to CAT. They applied for such relief with Sou as the principal applicant and Srey as his derivative beneficiary.

After a hearing, the Immigration Judge ("IJ") concluded that petitioners' accounts lacked credibility and denied their

---

decision; this evidence includes, among other things, a picture of him and his wife at an SRP rally in Lowell, Massachusetts, in February 2005 and reports of government abuses directed toward high-level SRP members. The Board treated the submission as a motion to reopen. It held, however, that the evidence was insufficient to meet the standard to reopen and apparently did not give any further consideration to the supplemental evidence. See 8 C.F.R. § 1003.2(c). Petitioners do not appeal this denial, but nevertheless make reference to various pieces of the supplemental evidence in their brief. By law, this court may decide the petition "only on the administrative record on which the order is based." 8 U.S.C. § 1252(b)(4)(A). For that reason, we will not consider the supplemental evidence.

-7-

application. The IJ focused on what he determined were a number of implausibilities in their story and concluded that the Cambodian government was not looking for Sou. In particular, he was unconvinced that the government would begin looking for Sou approximately a year and a half after Buntha's arrest and some months after his death. Further, Sou could have been found easily in a number of ways: through surveillance of his home or business (which was not closed until June 25); by checking with his relatives at their homes; or by intercepting him when he and his wife obtained their exit visas and attempted to leave the country. The IJ found Srey's testimony that she was questioned at gunpoint unconvincing. He added that, "to the extent that [their account] may be true . . . the Cambodian government has a legitimate concern in questioning associates of known and convicted terrorists in order to gather additional information." Therefore, the IJ concluded, petitioners failed to meet their burden to prove that (a) they were unable or unwilling to return to their country because of a well-founded fear of persecution on account of membership in a particular social group or political opinion; or (b) that it was more likely than not that they would be subject to government-sanctioned torture if removed to Cambodia.[9]

---

[9] Petitioners argue that the IJ's adverse credibility determination was arbitrary and capricious. However, the court's review is of the Board's decision, which assumed that petitioners were credible. Therefore, the court "cannot and need not review the credibility determination of the IJ." Xu, 424 F.3d at 48.

Petitioners timely appealed this decision to the Board. The Board "assum[ed] the credibility of [Sou and Srey's] testimony." It then related Srey's testimony that she "was confronted by Cambodian police and asked about the location of her husband," and their belief that "they are under investigation due to their affiliation with a friend who was arrested for terrorism." The Board found that they "have no political affiliations of their own, they were allowed to leave Cambodia, and their children remain in Cambodia at this time." It then concluded by "agree[ing] with the Immigration Judge that, under these circumstances, [they] have failed to demonstrate a well-founded fear of returning to Cambodia at this time," and dismissed their appeal.[10] Petitioners have petitioned for review of the Board's dismissal to this court, arguing that they have proved their entitlement to asylum.[11]

---

[10] The record does not contain petitioners' appeal of the IJ's decision to the Board. It is therefore not clear whether they also appealed the IJ's determination that they were not entitled to withholding of removal either on account of political opinion or membership in a particular social group or under the CAT. Petitioners have not argued to the court that the Board improperly failed to consider these latter grounds for relief. See Xu, 424 F.3d at 48 ("Issues not raised before the Board may not be raised for the first time upon judicial review of the Board's decisions.") (quoting Ravindran v. Immigration and Naturalization Serv., 976 F.2d 754, 761 (1st Cir. 1992)). The court notes, in any event, that the showing required to prove eligibility for withholding of removal is higher than that for asylum. See, e.g., Silva v. Ashcroft, 394 F.3d 1, 4 n.5 (1st Cir. 2005).

[11] Although petitioners' application included "membership in a particular social group" as one of their claimed bases for relief, there is no evidence that petitioners raised this issue before the Board and they did not argue the point in their brief.

## II. DISCUSSION

### A. <u>Standard of Review</u>

Where, as here, the Board does not summarily adopt the IJ's decision but instead makes an independent decision, the Board's decision is the final administrative order reviewed by the court. See <u>Xu</u>, 424 F.3d at 48; <u>Njenga</u> v. <u>Ashcroft</u>, 386 F.3d 335, 338 (1st Cir. 2004).

Our review of the Board's decision is quite limited. As to the Board's findings of fact, we shall deem them "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); <u>accord</u> <u>Olujoke</u> v. <u>Gonzales</u>, 411 F.3d 16, 21 (2005). The Board's decision whether to grant or deny asylum is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); <u>accord</u> <u>Huang</u> v. <u>Immigration and Naturalization Serv.</u>, 436 F.3d 89, 96 & n.9 (2d Cir. 2006); <u>see</u> <u>Immigration and Naturalization Serv.</u> v. <u>Elias-Zacarias</u>, 502 U.S. 478, 481 & n.1 (1992) (quoting the standard of review contained in former 8 U.S.C. § 1105a(a)(4)).[12]

_____

Furthermore, the record contains few, if any, facts identifying the social group of which they claim to be members and why they fear persecution on that basis. Accordingly, the court will not consider the claim in this proceeding. "Mere notation of the applicable law, without any argumentation as to how it applies to a petitioner's case, does not raise the issue of its application" on appeal. <u>Xu</u>, 424 F.3d at 49.

[12] The proper standard of review for asylum decisions has been the subject of some confusion, based in no small part on an apparent technical error in the Illegal Immigration Reform and

## B.  <u>Review of the Board's Decision</u>

To be eligible for asylum, an applicant bears the burden of proving that he or she qualifies as a "refugee" under the Immigration and Nationality Act ("INA").  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1); 8 C.F.R. § 208.13.  To so qualify, an applicant must be "unable or unwilling to return to, and [be] unable or unwilling to avail himself [] of the protection of [the

Immigrant Responsibility Act of 1996 ("IIRIRA").  Prior to the adoption of IIRIRA, the standard of review was set forth in former 8 U.S.C. § 1105a(a)(4).  <u>See</u> <u>Elias-Zacarias</u>, 502 U.S. at 481 & n.1 ("The BIA's determination [of an alien's eligibility] for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole'"; to reverse the Board's determination, "we must find that the evidence not only *supports* that conclusion, but *compels* it . . . ." ) (quoting statute; emphasis in original).  In 1996, Congress added 8 U.S.C. § 1252(b)(4)(D) as part of IIRIRA.  Pub. L. No. 104-208, § 306(a), 110 Stat. 3009-608 (1996).  That section purports to provide the standard of review as to "the Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title."  In fact, however, 8 U.S.C. § 1158(a) says nothing about the Attorney General's discretionary judgment to grant asylum, but instead addresses an alien's ability to apply for asylum.  Prior to the enactment of IIRIRA, section 1158(a) did contain such a reference, but the subject matter of former section 1158(a) was split under IIRIRA into new sections, 1158(a) and 1158(b).  Section 1158(b) now contains the relevant language addressing the Attorney General's "discretionary judgment."  We agree with the Second Circuit that Congress intended that the standard of review set forth in section 1252(b)(4)(D) apply to review of determinations whether to grant asylum under section 1158(b).  See <u>Huang</u>, 436 F.3d at 96 & 97 n.9.

Although the phraseology of § 1252(b)(4)(1) is somewhat different than the standard of review noted in our recent cases (many of which quote <u>Elias Zacarias</u>), the net result is the same; a Board decision that is not based on substantial evidence in the record is, *a fortiori*, manifestly contrary to law and an abuse of discretion and, accordingly, will be set aside.  <u>See</u>, <u>e.g.</u>, <u>Olujoke</u>, 411 F.3d at 21; <u>Khem</u> v. <u>Ashcroft</u>, 342 F.3d 51, 53 (1st Cir. 2003).

country of his nationality or, if he has no nationality, the country in which he last habitually resided] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A); accord 8 C.F.R. § 208.13(b). An applicant may meet this burden by proving that he has suffered persecution in the past on one of the aforementioned grounds (entitling him to a rebuttable presumption in his favor) or by establishing his "well-founded fear of future persecution." Khem, 342 F.3d at 53. To establish a well-founded fear of future persecution, the applicant must prove his fear both subjectively and objectively. Id. "[T]he objective component requires showing by 'credible, direct and specific evidence' that this fear is reasonable." El Moraghy v. Ashcroft, 331 F.3d 195, 203 (1st Cir. 2003) (quoting Velasquez v. Ashcroft, 316 F.3d 31, 35 (1st Cir. 2002)).

Petitioners' appeal concerns only their claim of future persecution on the basis of political opinion. Sou does not argue that he suffered past persecution.

As noted, we assume petitioners to be credible. In our review, we consider only the reasons stated by the Board for denying relief and do not independently consider whether other grounds would be supported by the record. El Moraghy, 331 F.3d at 203; Yatskin v. Immigration and Naturalization Serv., 255 F.3d 5,

-12-

9 (1st Cir. 2001).[13]  The Board determined that petitioners had not met their burden by proffering sufficient evidence in support of their application for asylum.  Although a fuller explanation by the Board would certainly aid our review, it contained the minimally required reasoning to support its decision in light of the strength of petitioners' evidence.

The only finding of fact that petitioners challenge is the Board's finding that they had "no political affiliations of their own."  However, nothing in the record compels a contrary finding.  Petitioners testified that they were not members of any political organization.[14]  They were not political activists, and their support for the SRP was relatively limited.  Their social relationship with Buntha related to the CFF in only the most oblique sense.  Finally, Sou's service in the military ended approximately 27 years before the events of 2002 leading to their departure.  Thus, while petitioners were not entirely apolitical,

---

[13] The Board's decision must be "sufficiently clear to support our review."  Xu, 424 F.3d at 49.  Although the decision here was "brief and summary in tone," it is clear enough to allow meaningful review.  See id.  There is no "*per se* rule requiring an explicit holding as to every factor that an [administrator] might find relevant in making a determination.  This is because, '[w]hen considering whether the clarity of an administrative decision is sufficient to support our review, . . . we are not . . . oblivious of the record on which it is based.'"  Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir. 2005) (quoting Xu, 424 F.3d at 49).

[14] As noted, Sou apparently joined the SRP after he left Cambodia.

-13-

the record does not compel the conclusion that they had political affiliations.[15]

Turning to the merits, we conclude that the Board's decision was not "manifestly contrary to law and an abuse of discretion" for at least four reasons.

First, petitioners' involvement in political organizations was low-level to nonexistent (and in the case of the military, decades-old); that is not sufficient, by itself, to establish that the political beliefs of those organizations would be imputed to them or that they would be targeted on the basis of their tangential connections. See Khem, 342 F.3d at 54 (petitioner was "low-level party member" who was a paid fundraiser for the party, did not make public speeches, and never held party office; substantial evidence supported IJ's conclusion that she had not demonstrated a well-founded fear of persecution). Nor does their friendship with Buntha establish that his opinions or membership in the CFF would be imputed to them. See id. at 53 (no evidence that petitioner herself would be targeted because of her husband's political beliefs). While petitioners argue that the Board

---

[15] Petitioners also argue that the Board's finding that they had no political affiliation was limited to a reading of the IJ's opinion and failed to take into account evidence that would support a contrary conclusion. Petitioners claim that this is a "denial of due process by the BIA." However, the Board's decision, though brief, indicates that the review was limited to the record that was developed before the IJ and includes some citations to that record. The Board need not discuss each piece of evidence. See Khalil v. Ashcroft, 337 F.3d 50, 56 (1st Cir. 2003).

-14-

"ignored and failed to properly value" country condition reports that detail government abuses directed toward SRP candidates, activists, and high-level SRP lawmakers, there was no showing that petitioners are situated similarly to those who suffered these abuses. Accordingly, it was not error for the Board to conclude that they had not demonstrated that their fear of suffering the same abuse is well-founded. See id. at 54 ("[C]ountry conditions reports do not document persecution of low-level party members . . . .").

Second, the Board noted that petitioners had left the country freely. Indeed, their movements were largely unimpeded: they sold the drug store inventory, obtained visas from the U.S. embassy, obtained exit stamps in their passports from the Cambodian government (although Sou's was obtained by another person), and were not questioned or detained as they boarded their flight. Their conclusory testimony that Sou was in "hiding" and that they feared for their safety does not meet their burden of proving that their fear was objectively reasonable by "direct and specific evidence." See El Moraghy, 331 F.3d at 203 (internal quotation marks removed).

Third, petitioners' children remain in Cambodia. Nothing in the record suggests that they, or any of the petitioners' other relatives, are being persecuted. "The fact that close relatives continue to live peacefully in the [petitioners'] homeland

undercuts the [petitioners'] claim that persecution awaits [their] return." Guzman v. INS, 327 F.3d 11, 16 (1st Cir. 2003) (quoting Aquilar-Solis v. INS, 168 F.3d 565 (1st Cir. 1999)).

Finally, the length of time between the arrest of Buntha (in December 2000) and the government's attempt to question Sou (in early May 2002) suggests that Sou was not considered a threat to the government or even a particularly high priority for questioning. Again, while not conclusive, that delay tends to undercut the reasonableness of any fear of persecution.

## III. CONCLUSION

In summary, the Board's conclusion was not "manifestly contrary to the law and an abuse of discretion" under 8 U.S.C. § 1252(b)(4)(D). We are sympathetic to petitioners' past hardships and concern for the future, and acutely aware of the tragic experience of the Cambodian people over the past several decades. Nonetheless, the Board's decision is in accordance with the law and will not be overturned.

**The petition for review is denied.**