USCA1 Opinion

 

United States Court of Appeals
For the First Circuit

No. 07-1273

VLLASI CUKO,

Petitioner,

v.

MICHAEL B. MUKASEY,

 ATTORNEY GENERAL,

Respondent.
                       

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

 

Before

Torruella, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

 

    Michael D. Greenberg and Law Offices of Michael D. Greenberg
on brief for petitioner.
    Robbin K. Blaya, Attorney, Office of Immigration Litigation,
U.S. Department of Justice, Peter D. Keisler, Acting Attorney
General, Anthony W. Norwood, Senior Litigation Counsel, on brief
for respondent.
 

March 31, 2008
 

         LYNCH, Circuit Judge. Vllasi Cuko, a citizen and
national of Albania, petitions for review of an order of the Board
of Immigration Appeals (BIA), which affirmed an immigration judge's
(IJ) denial of his application for political asylum. 
I
BACKGROUND
         After Cuko entered the United States via Italy in July
2001, he was placed in removal proceedings and filed an application
for asylum, withholding of removal, and protection under the
Convention Against Torture (CAT), predicated on allegations of
persecution based on his political opinions. At the removal
hearing, Cuko testified that the former Communist government of
Albania forcibly interned his family in a concentration camp during
the 1970s and 1980s. After the fall of the Communist government in
1990, Cuko became an active member of his hometown chapter of the
Democratic Party. The Democratic Party's major political opponent
is the Socialist Party, the legal successor to the Albanian
Communist Party.
         Cuko also testified that, in November 2000, he allowed
his official membership in the local chapter of the Democratic
Party to lapse because he had decided to sell his home and relocate
his family to the capital, but that he ultimately was unable to
acquire a new house.
         Cuko testified that, in February 2001, he helped to
organize, and participated in, a Democratic Party election rally in
Fier. Later that evening, his house was stoned and his family
terrorized by unknown masked individuals. Shortly thereafter, Cuko
and his wife began receiving anonymous telephone threats that their
son would be kidnapped if Cuko did not cease his activities with
the Democratic Party, and Cuko paid to have his wife and son
smuggled into the United States. When Cuko held another party
rally on March 21, the police – who, Cuko claims, are all Socialist
Party supporters – arrested him, held him for several hours, and
insulted and beat him. When the Democrats lost the election to the
Socialists, Cuko sold his house, then left for the United States
via Italy.
         The IJ denied Cuko's application for asylum and
withholding of removal and his claim for relief under the CAT. In
an oral decision, the IJ began by noting that Cuko's testimony was 
inconsistent, both internally and with some exhibits, and that his
demeanor suggested mendacity.
         The IJ then described the present country conditions in
Albania and noted that there were no longer any indications of
systemic political persecution against Communist Party opponents. 
The IJ found that even if he credited Cuko's account that he and
his family were interned in a labor camp in the 1970s, virtually
all Albanians suffered similarly from the years 1945 to 1990. 
Therefore, even if Cuko could credibly show past persecution, the
presumption of a well-founded fear of future persecution would be
overcome by the changed country conditions.
         The IJ further noted that he did "not . . . find the
applicant to be a credible witness in any regard in this case. 
[The IJ] has carefully observed the applicant's demeanor throughout
this hearing and finds the applicant to be a furtive, evasive, and
wholly incredible witness."
         The IJ then specifically detailed the bases for his
adverse credibility determination. First, the IJ noted that Cuko
testified that, after he had arrived in the United States, he asked
his father-in-law in Albania to obtain Cuko's party membership card
from the Democratic Party archives and mail it to him. Moments
later, Cuko "completely changed his testimony" to say that he had
left the card at his home when he departed Albania. Immediately
thereafter, he changed his testimony again and said that he had
given the card to his father-in-law before departing for the United
States. The IJ noted, in particular, that based on Cuko's
demeanor, Cuko seemed to modify his second answer as soon as he
realized that it was inconsistent with his earlier testimony that
he had sold his home before leaving Albania. "[I]t actually
appeared that [Cuko] was giving answers then realizing that his
prior testimony conflicted with these answers, and he would then
change his answer and give another one that he thought would be
more plausible and so on until he ended up with the final version
of his testimony." The IJ noted that Cuko had also not
appropriately authenticated the membership card even though it was
clear that Cuko was well aware of the procedures for
authentication.
         Second, the IJ observed that a certificate dated December
28, 2001, from the local Democratic Party branch office, which
certified that Cuko "has been a member of this party from 1992 till
[sic] November of the year 2000 and has regularly paid the monthly
membership fees to the party," contradicted Cuko's testimony that
he was an active and vibrant Democratic Party member and organizer
through his arrest in March 2001.
         The IJ also rejected, as "wholly unsatisfactory," Cuko's
explanation for the November 2000 membership termination: that he
had intended to move to another town and reregister with its local
Democratic Party branch, but that he ultimately failed in his
efforts to buy a new house in the other locality, and decided to
stay in Fier. If this were true, the IJ noted, it would be likely
that the letter would have mentioned that he had remained active,
especially in light of his purported efforts as an organizer up
until his arrest in March 2001.
         In addition, the IJ determined it "inconceivable" that
the December 2001 certificate, written by the chairman of the local
Democratic Party and purportedly issued after the alleged
harassments, assaults, arrest, and beatings of Cuko in the spring
of 2001, never mentioned this persecution.
         The IJ found that these two discrepancies and
inconsistencies were material and went to the heart of the
applicant's asylum claim and that in light of them, Cuko could not
be found to be a credible witness. 
         Finally, the IJ noted other discrepancies. Cuko's
testimony about how much and when Cuko paid to have his wife and
child smuggled out of Albania changed from one moment to the next
and directly contradicted the testimony of his wife. His demeanor
was "completely evasive and nonresponsive" when he was testifying
as to the source of the money used to pay the smugglers. Cuko
appeared to say that he sold one of the two houses he owned to
raise the money, but his wife clearly testified that they owned
only one home in Albania. The IJ also noted that the timing of the
sale of the house was "completely unclear" to the IJ. The IJ found
Cuko's testimony "simply . . . not . . . to be credible" on this
point, and that "the truth is something other than the applicant's
testimony, that is, that the applicant and his family had plans to
come to the United States, and they have concocted this story in an
effort to obtain lawful permanent residence . . . ."

 
         The IJ concluded that these discrepancies became material
in combination with Cuko's other perjurious testimony regarding his
party membership card and the December 2001 certificate.
         The IJ, having rejected the application for asylum,
rejected Cuko's claim for withholding of removal, noting that the
latter requires a higher burden of proof. The IJ also rejected
Cuko's claim for relief under the CAT, based both on his finding
that Cuko was not credible and that there was no record support
that it was more likely than not Cuko would be tortured were he to
return to Albania, especially given the country's changed political
circumstances.
         After Cuko appealed the IJ's decision, the BIA affirmed
and adopted the IJ's decision "finding the applicant not credible,"
in a brief, but not summary, opinion. Based on an examination of
the record, the BIA disposed of Cuko's contention on appeal that
the IJ's conduct in questioning Cuko went beyond his authority. 
The BIA also found sufficient record support to uphold the IJ's
adverse credibility finding. The BIA affirmed the finding that
based on State Department country reports, Cuko did not have a
well-founded fear of future persecution. Cuko then petitioned for
review of the BIA's final decision.
 
 
II
DISCUSSION
         Cuko's petition argues that the BIA erred in sustaining
the decision of the IJ denying Cuko asylum, withholding of removal,
or relief under the CAT. He claims again that the IJ improperly
assumed the role of a government attorney. He argues the IJ's
adverse credibility determinations, which the IJ based on his
perceptions of testimonial inconsistencies and witnesses'
demeanors, and upon which he founded his denial of Cuko's asylum
application, are not supported by the record.
         "Where, as here, 'the BIA adopted and affirmed the IJ's
ruling, but also discussed some of the bases for the IJ's opinion,
we review both the IJ's and BIA's opinions.'" Lin v. Gonzales, 503
F.3d 4, 6-7 (1st Cir. 2007) (quoting Zheng v. Gonzales, 475 F.3d
30, 33 (1st Cir. 2007)). When the BIA adopts the IJ's decision, we
cannot disregard the particular findings of the IJ just because the
BIA does not expressly address them. See, e.g., Chanthou Hem v.
Mukasey, 514 F.3d 67, 69 (1st Cir. 2008) (reviewing both the IJ's
and the BIA's opinion when the BIA adopts and affirms the IJ's
ruling and discusses "some of the IJ's bases for decision"); Lin,
503 F.3d at 6-7 (same); Yu v. Gonzales, 502 F.3d 17, 19 (1st Cir.
2007) (same); Zheng, 475 F.3d at 33 (same).
A.      Adverse Credibility Determination
         "Where the BIA has adopted the IJ's credibility
determination, as here, we review the determination of the IJ."
Mewengkang v. Gonzales, 486 F.3d 737, 739 (1st Cir. 2007); see
also, e.g., Chanthou Hem, 514 F.3d at 69.
          Since the IJ has the best vantage point from which to
assess the witnesses' testimonies and demeanors, we accord
significant respect to these witness credibility determinations. 
Afful v. Ashcroft, 380 F.3d 1, 4 (1st Cir. 2004). Accordingly, we
review the IJ's adverse credibility determination under the
deferential "substantial evidence" standard, and must sustain it
"unless the record evidence would compel a reasonable factfinder to
make a contrary determination." Stroni v. Gonzales, 454 F.3d 82,
87 (1st Cir. 2006) (emphasis added). Specifically, we narrowly
inquire whether: (i) the discrepancies articulated by the IJ and/or
the BIA are actually present in the administrative record; (ii) the
discrepancies generate specific and cogent reasons from which to
infer that petitioner or his witnesses provided non-creditworthy
testimony; and (iii) petitioner failed to provide a persuasive
explanation for these discrepancies. Hoxha v. Gonzales, 446 F.3d
210, 214 (1st Cir. 2006); In re A-S, 21 I. & N. Dec. 1106, 1109
(BIA 1998).
         1.  The Custody Chain of the Democratic Party
Membership Card
         As the first ground for his adverse credibility
determination, the IJ noted that Cuko gave three different accounts
as to how he obtained his Democratic Party membership card as a
supporting exhibit. The IJ also found that Cuko's demeanor led the
IJ to believe that Cuko gave the multiple accounts because he
recognized the inconsistency between his prior account and his
other testimony.
         These discrepancies in Cuko's testimony about how he
obtained the Democratic Party membership card are clearly present
in the administrative record. They are based not only on
inconsistency of statements but also on observation of demeanor. 
They also go the heart of Cuko's claim of persecution based on
political beliefs.

 See Bojorques-Villanueva v. INS, 194 F.3d 14,
16 (1st Cir. 1999). Further, the IJ considered Cuko's explanation
for his inconsistencies in testimony, and found it was not credible
because his answer appeared to change only after he realized it
conflicted with his prior testimony. See Simo v. Gonzales, 445
F.3d 7, 12 (1st Cir. 2006) ("Our cases make frequent reference to
the failure of a petitioner to sufficiently explain
inconsistencies." (citing Chen v. Gonzales, 418 F.3d 110, 113 (1st
Cir. 2005); Dhima v. Gonzales, 416 F.3d 92, 96 (1st Cir. 2005))).
         Under our deferential standard of review, we cannot say
that the record compels us to make a determination contrary to that
of the IJ. The IJ's determination was also based on Cuko's
demeanor, and the IJ's findings as to demeanor are subject to great
weight. See, e.g., Rodriguez Del Carmen v. Gonzales, 441 F.3d 41,
43 (1st Cir. 2006) ("Matters of witness credibility and demeanor
are peculiarly for the factfinder.").
         2.  The December 2001 Certificate from Party Chairman
         As the second ground for his adverse credibility
determination, the IJ observed that the December 28, 2001
certificate, in which the local party chairman certified that Cuko
had paid party dues from 1992 through November 2000, contradicted
Cuko's testimony that he remained an active Democratic Party member
into early 2001, and that Cuko's explanation for terminating his
membership (viz., his aborted attempt to purchase a house in
Tirana) was "wholly unsatisfactory." 
         In addition, the IJ found that the December 2001
certificate reasonably should have included (but did not) some
account of the political persecution that Cuko purportedly suffered
in early 2001. Cuko's explanation that the December 2001
certificate was just a ministerial verification of Cuko's official
enrollment dates in the party was undercut by the evidence that the
December 2001 certificate did make reference to Cuko's forced labor
under the prior Albanian regime. Again, under our deferential
standard of review, it was reasonable for the IJ to note the
inconsistencies and find Cuko's explanation inadequate.

         Cuko argues that the even if he was no longer an active
Democratic Party member, he may still be at risk of political
persecution because he was perceived to be a Democratic Party
member. It is correct, but not material here, that an asylum claim
can be predicated not only on an applicant's actual political
affiliation, but on his perceived affiliation with a particular
political opinion. See Mekhoukh v. Ashcroft, 358 F.3d 118, 125
(1st Cir. 2004); Alvarez-Flores v. INS, 909 F.2d 1, 4 (1st Cir.
1990) ("[A]n imputed political opinion, whether correctly or
incorrectly attributed, can constitute a ground of political
persecution within the meaning of the [Immigration and Nationality]
Act."); see also Koudriachova v. Gonzales, 490 F.3d 255, 264 (2d
Cir. 2007) ("[T]he relevant question is not whether an asylum
applicant subjectively holds a particular political view, but
instead whether the authorities in the applicant's home country
perceive him to hold a political opinion and would persecute him on
that basis."); Gao v. Gonzales, 424 F.3d 122, 129 (2d Cir. 2005);
8 C.F.R. § 208.13(b)(2)(iii). 
         This point is irrelevant to the IJ's determination,
however. The IJ used the discrepancy over Cuko's party membership
dates as one of many factors, including its finding that "his
demeanor suggested mendacity," to find Cuko was personally not
credible. The IJ's basis of decision was not that because Cuko was
no longer a Democratic Party member, he would not have been subject
to persecution; it was that because of Cuko's testimonial
inconsistencies and demeanor, Cuko did not meet his burden of
showing a well-founded fear of persecution.
         Further, this was not a case in which Cuko was not
afforded an opportunity to explain the inconsistency. See Hoxha,
446 F.3d at 214 (noting that the asylum applicant must provide a
persuasive explanation for the purported discrepancies); Zi Lin
Chen v. Ashcroft, 362 F.3d 611, 618 (9th Cir. 2004) (noting that
asylum applicant should be afforded "a reasonable opportunity to
explain what the IJ perceived as an inconsistency in her
testimony"). Cuko attempted to explain the inconsistency by his
aborted move to Tirana. The IJ found that explanation also to be
not credible, and the record does not compel a contrary finding. 
         3.  The Testimony Concerning the Cukos' Smuggling
Transaction
         As another ground for his adverse credibility
determination, the IJ cited discrepancies between the testimony of
Cuko and his wife concerning details of the transaction by which
Mrs. Cuko was smuggled to the United States. Because Cuko's
petition pre-dates the effective date of the Real ID Act, our
deferential standard of review is subject to an important caveat:
"[A]n adverse credibility determination cannot rest on trivia but
must be based on discrepancies that involved the heart of the
asylum claim." Lin, 503 F.3d at 7 (quoting Bojorques-Villanueva,
194 F.3d at 16) (internal quotation marks omitted). The IJ found
that these discrepancies as to the smuggling, when combined with
Cuko's other testimony, became "material" and went to the heart of
his claim. The BIA considered the inconsistencies in the testimony
regarding the Cukos' smuggling transaction; while "collateral" to
Cuko's claim if viewed alone, they still provided additional
support for the IJ's adverse credibility finding. "While these
additional discrepancies do not necessarily go to the heart of
Lin's persecution claim, and thus might not be enough standing
alone to support an adverse credibility finding, . . . in this
case they provide further support for the IJ's conclusion that
[petitioner] was not candid in her recitation of events." Id. at
8 (citations omitted). The inconsistencies about the funding and
selling of the home, which provided the source of money to pay the
smugglers, raised issues of credibility regarding Cuko's reasons
for fleeing to the United States, which go to the heart of his
application. The record does not compel a different conclusion.
         4.  Other Concerns
         Cuko argues that the IJ purported to base his adverse
credibility decision, in part, on "material inconsistencies and
discrepancies between the applicant's written asylum application
and his testimony," but then did not, in the remainder of his
decision, cite any specific examples of such discrepancies.
(Emphasis added.) As described above, the IJ does explain the
inconsistencies between Cuko's testimony and the exhibits that Cuko
submitted. Regardless, the IJ had sufficient other grounds, based
on the testimony alone, upon which to rest his adverse credibility
determination, and no prejudice would have resulted to Cuko. 
         Further, the IJ noted that even if Cuko had met his
burden of showing he had been persecuted as an active Democratic
Party member (and he had not), "the background information does not
corroborate his claim that persecution awaits him upon his return
to Albania," and therefore, he "cannot establish that he has a
well-founded fear of suffering future persecution." This
background information, namely the State Department country reports
– which note only minimal political violence and retaliation in
present-day, post-Communist Albania - refute the contention that
his family would be harmed in the future if they returned to
Albania. This finding is relevant to Cuko's failure to prove a
well-founded fear of future persecution. Even if Cuko had shown he
suffered past persecution, which he did not, the IJ's reliance on
the State Department reports was sufficient to "rebut[] the
presumption of a well-founded fear of future persecution arising
from allegations of past persecution based on support for the
Democratic Party." Gjiknuri v. Mukasey, No. 07-1328, 2008 WL
132130, at *3 (1st Cir. Jan. 15, 2008); Alibeaj v. Gonzales, 469
F.3d 188, 192-93 (1st Cir. 2006); Tota v. Gonzales, 457 F.3d 161,
167 (1st Cir. 2006). The record does not compel a contrary
conclusion.
         In any event, the adverse credibility determination
defeats the petitioner's asylum claim. See Dine v. Gonzales, 464
F.3d 89, 93 (1st Cir. 2006) ("[W]hen a petitioner's case depends on
the veracity of . . . testimony, a fully supported adverse
credibility determination, without more, can sustain a denial of
asylum." (quoting Olujoke v. Gonzales, 411 F.3d 16, 22 (1st Cir.
2005)) (internal quotation marks omitted)). The denial of Cuko's
asylum claim also effectively disposes of his withholding of
removal claim. See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir.
2004) ("A claim for withholding of deportation demands that the
alien carry a more stringent burden of proof than does an asylum
claim. Thus, if an alien cannot establish asylum eligibility, his
claim for withholding of deportation fails a fortiori.").
         In this case, the petitioner's brief does not advance any
arguments specific to his CAT claim. To the extent that the claim
is not waived, see Dine, 464 F.3d at 93, Cuko's CAT claim was
predicated on the veracity of his testimony and the current
Albanian political climate, and so this claim, too, fails.
B.      The Conduct of the Immigration Judge
         Cuko makes a perfunctory argument that the IJ overstepped
his authority by assuming the role of a government attorney and
engaged in "prosecutorial questioning." The BIA rejected this
position, as we do. The petitioner's brief points to no specific
instance in the record to support this claim. It is well settled
that "issues adverted to in a perfunctory manner, unaccompanied by
some effort at developed argumentation, are deemed waived." United
States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). 
         Regardless, it is clear from the hearing transcripts that
the IJ was acting within his broad discretion. See 8 U.S.C.
§ 1229a(b)(1) (authorizing the IJ to "receive evidence,
interrogate, examine, and cross-examine the alien or witnesses");
Jorgji v. Mukasey, 514 F.3d 53, 59 (1st Cir. 2008). We agree with
the BIA that "the questions and warnings directed to the applicant
by the IJ [do not] indicate any pre-disposed bias against the
applicant, or [go] beyond the [IJ's] broad discretionary authority
to control the pace and scope of the hearing." Cuko's opportunity
to present his case was not restricted.
III
CONCLUSION
    The petition for review is denied.
 
-Dissenting Opinion Follows-

         CYR, Senior Circuit Judge (dissenting). Because the
majority seriously misreads the appellate record, and particularly
the agency’s two written decisions, I respectfully dissent. In
deferring wholesale to the agency’s credibility determinations in
these circumstances, the majority turns our review function into a
hollow exercise in rubber-stamping.
I. 
         In assessing pivotal credibility determinations, we must
– at the very least – hold the agency to its word. If the BIA had
merely affirmed and adopted the IJ’s decision without further
elaboration, we would review the IJ’s rationales directly and
exclusively. Importantly, however, that is not what the BIA’s
decision purported to do; it added its own gloss. The BIA
expressly did not “affirm” – but instead rejected – the IJ’s
decision that the discrepancies concerning how Cuko smuggled his
wife and child into the United States could be weighed in assessing
his credibility: “[W]e agree with the applicant that the
inconsistencies in the record concerning how much he paid to have
his wife and son smuggled into the United States are collateral to
his asylum claim.” (Emphasis added.) The majority’s insistence
to the contrary is directly at odds with this plain language.
         Further, although the BIA is not required to catalog
every basis for affirming an IJ’s credibility decision, and indeed
could have simply affirmed the IJ’s remaining rationales without
comment, the BIA in this case expressly stated that it had found
“sufficient other evidence in the record to support the [IJ’s]
credibility finding.” See Sou v. Gonzales, 450 F.3d 1, 7 (1st Cir.
2006) (“In our review, we consider only the reasons stated by the
Board for denying relief and do not independently consider whether
other grounds would be supported by the record.”). If the BIA had
proceeded merely to give an example of this “other evidence,” one
reasonably might argue that it implicitly was affirming all of the
IJ’s remaining rationales. Rather than begin the next sentence
with the phrase “For example,” however, the BIA begins with
“Specifically,” which connotes that it intends to identify the
“other evidence” that independently supports its affirmance. See
Tobon-Marin v. Mukasey, 512 F.3d 28, 30 (1st Cir. 2008) (“As the
BIA adopted and supplemented the IJ's opinion with its own
substantive gloss, we evaluate both the IJ's decision and the BIA
decisions.”); Xue Hong Yang v. United States Dep't of Justice, 426
F.3d 520, 522 (2d Cir. 2005) (noting that when the BIA affirms the
IJ’s decision in all respects but one, the appellate court must
review the IJ's decision as modified by the BIA decision, “minus
the single argument for denying relief that was rejected by the
BIA”). Given this choice of language, we must ask whether the
specific evidence cited as a ground for affirmance – that the party
certificate per se contradicts Cuko’s testimony that he remained an
“active” and “recognized” party member in February and March 2001
– meets the three-part appellate review standard (viz., the
presence of an actual discrepancy which generates specific reasons
to suspect the applicant’s veracity, and for which he has provided
no persuasive explanation). See Hoxha v. Gonzales, 446 F.3d 210,
214 (1st Cir. 2006); In re A-S, 21 I. & N. 1106, 1109 (BIA 1998).
         The majority mistakenly suggests that even this narrower
BIA determination is itself a sufficient ground to deny Cuko’s
petition for review. The putative discrepancy – the Party
certificate’s necessary implication that Cuko thereafter became
“inactive” in his party activities – is simply not a self-evident
inconsistency. An asylum applicant might testify, for example,
that he entered the country from Canada, then testify later that he
entered the country from Mexico. In that case of facial
inconsistency (viz., both versions of the historical facts cannot
be simultaneously true), we would be hard-pressed to find that the
IJ could not rely on that unexplained inconsistency in finding the
applicant not worthy of credence. 
         By contrast, the Party certificate suggests only that
Cuko, a long-time party member, stopped paying his dues in November
2000. When specifically asked to explain why he had stopped paying
his dues, he testified that he had planned unsuccessfully to
relocate to Tirana to escape increased political persecution. He
later testified, however, that he remained “active” in the Party
after November 2000, and continued to be “recognized” as an active
party member and organizer. Unlike the black-and-white Canada-Mexico discrepancy hypothesized above, however, the perceived
discrepancy between the concepts “non-dues-paying” and “active” is
hardly inexorable. See San Kai Kwok v. Gonzales, 455 F.3d 766, 769
(7th Cir. 2006) (“‘[A]dverse credibility determinations should not
be grounded in . . . easily explained discrepancies’ because such
bases lack the necessary ‘legitimate nexus to the finding.’”)
(citation omitted); Ming Shi Xue v. BIA, 439 F.3d 111, 114-115 (2d
Cir. 2006) (“[W]hen an inconsistency is not self-evident, an IJ may
not rely on it to support a credibility determination without first
bringing the perceived discrepancy to the alien's attention,
thereby giving the alien an opportunity to address and perhaps
reconcile the seeming inconsistency, to the IJ's satisfaction, at
the least.”); accord He Chun Chen v. Ashcroft, 376 F.3d 215, 224
(3d Cir. 2004) (“[A]mbiguous answers at airport interviews should
not be relied upon to question the credibility of the alien . . .
.”). The adjective “active” obviously requires some further
definition and explanation, and in this instance, the IJ did not
point out the perceived inconsistency to Cuko at the hearing, nor
did he allow Cuko a reasonable opportunity to explain why or how
the two items of evidence were not discrepant. Under the first
criterion of the Hoxha standard of review, there simply is no
actual discrepancy. See, e.g., Bandari v. INS, 227 F.3d 1160, 1167
(9th Cir. 2000) (finding no actual inconsistency between two
statement that IJ perceived as discrepant). 
         The certificate proves, at most, that Cuko’s official
membership in the party terminated when he ceased paying dues in
November 2001, as Cuko freely admitted. The IJ neither sought out
nor received any evidence, however, that Democratic Party rules
forbade persons, whose official party membership had lapsed, from
continuing to participate in or to organize party election rallies,
and/or that the party actively monitored such participants to
ensure that their formal party membership had not expired. Nor was
Cuko ever asked to explain the perceived inconsistency. Hoxha,
446 F.3d at 214 (noting that petitioner must have failed to provide
a persuasive explanation for the purported discrepancies). During
the period from November 2000 to March 2001, Cuko purportedly was
planning a move to Tirana, but reasonably may have decided to
participate in local party election activities pending that
relocation. 
         More importantly, even if evidence had been presented to
the effect that the Party forbade its expired members from taking
part in any further party activities and events, Cuko testified
that, due to his longstanding and high-profile affiliation with the
Democratic Party, most people in town still would “recognize” him
as a party member, whether or not his official membership had
terminated. Indeed, it is unlikely that the Democratic Party’s
political opponents – for example, according to Cuko, the police – 
would be privy to internal party documentation attesting to the
termination of Cuko’s official membership. An asylum claim can be
predicated not only on an applicant’s actual political opinion or
affiliation, but on his perceived affiliation with a particular
political opinion. See Mekhoukh v. Ashcroft, 358 F.3d 118, 124
(1st Cir. 2004); see also Koudriachova v. Gonzales, 490 F.3d 255,
264 (2d Cir. 2007) (“We explained that the relevant question is not
whether an asylum applicant subjectively holds a particular
political view, but instead whether the authorities in the
applicant's home country perceive him to hold a political opinion
and would persecute him on that basis.”); Chun Gao v. Gonzales, 424
F.3d 122, 129 (2d Cir. 2005) (“‘[A]n imputed political opinion,
whether correctly or incorrectly attributed, can constitute a
ground of political persecution within the meaning of the
Immigration and Nationality Act.’”)(quoting Alvarez-Flores v. INS,
909 F.2d 1, 4 (1st Cir. 1990)). 
         By denying Cuko’s petition for review on this basis, the
majority essentially condones and rubber-stamps an undesirable
policy and practice: an IJ silently may collect what he perceives
as testimonial discrepancies of a latent kind which would not be
readily apparent to the asylum applicant or his counsel, offer the
applicant no contemporaneous opportunity to explain why his
perception is faulty, and then blindside the applicant after the
fact with an asylum decision premised entirely on his untested
adverse credibility findings. This practice is not only at odds
with our clear precedent, but would subvert the essential truth-seeking function of asylum proceedings. 
II.
         Even if my interpretation of the BIA decision were
arguable, and we were permitted to review the IJ’s other rationales
for the adverse credibility determination, the other discrepancies
identified by the IJ are not objectively supportable grounds for
his adverse credibility finding.
A.  Cuko’s Chain of Custody Testimony
         With respect to the alleged discrepancy in Cuko’s
accounts as to how he obtained his Democratic Party membership card
as a hearing exhibit, the inconsistency in his accounts is self-evident, and the IJ afforded Cuko adequate opportunity to explain
them. 
         That said, the BIA’s refusal to mention the IJ’s chain-of-custody rationale as a ground for its affirmance is not
surprising. When an IJ bases an adverse credibility determination
on alleged testimonial discrepancies, he or she must be especially
“‘sensitive to the complexities of receiving testimony through a
translator,’” and the possibility “that the alleged discrepancy
resulted from confusion, and not an attempt at fabrication.” Heng
v. Gonzales, 493 F.3d 46, 49 (1st Cir. 2007) (citing Giday v.
Gonzales, 434 F.3d 543, 549 n.2 (7th Cir. 2006)). When the IJ
asked Cuko to explain why he first testified that his father-in-law
had obtained the membership card from the party archives after Cuko
arrived in the United States, Cuko stated that he had been
“confused,” since other documents comprising Exhibit 5 were so
obtained, but then he had recalled that it was not necessary for
his father-in-law to get the card from the archives because Cuko
already had the card in his possession before he left Albania. 
         A close review of the record amply supports the
plausibility of Cuko’s explanation. The crux of this inquiry was
whether Cuko was a Democratic Party supporter, and the fact that
the Party issued this card would tend to prove that fact. The
particulars of whether Cuko’s father-in-law retrieved the card
directly from the Party archives, from Cuko’s home, or from Cuko
himself, are not particularly important to that core inquiry. 
Moreover, even the attorneys experienced considerable confusion
over this line of questioning, and expressed doubts whether Cuko
had even been shown the correct hearing exhibits during his
previous testimony. Rather than take steps to insure that Cuko’s
explanation was not bona fide, however, the IJ simply forged ahead.
If even attorneys proficient in English were so befuddled, we can
hardly have great confidence that Cuko was not. Id. 
B.  Party Certificate
         Tellingly, the BIA affirmed solely on the IJ’s rationale
that the Party certificate’s declaration that Cuko stopped paying
party dues in November 2000 was inconsistent with his testimony
that he remained “active” in party activities thereafter. Its
silence as to the IJ’s two other sub-rationales based on the Party
certificate speaks volumes. The Cuko explanation for stopping his
payment of dues – that he unsuccessfully contemplated a relocation
to Tirana to avoid increased political persecution during the
upcoming election season – is not inherently implausible. The
record also contains no affirmative evidence tending to show Cuko’s
explanation was a mere fabrication.
         By the same token, the IJ’s assertion that one reasonably
should expect that this type of Party certificate would contain a
detailed narrative of Cuko’s history with the Party, and especially
of the specific acts of political persecution allegedly inflicted
on him in early 2001, is rank speculation. The terse certificate
purported only to be a ministerial verification of Cuko’s official
enrollment dates in the party. It indicated that it was issued at
Cuko’s request (viz., to verify that he was affiliated with the
Party), which means that it likely would confine its subject matter
to the specific and narrow question that Cuko’s application posed. 
Again, the record contains no evidence that these certificates
typically would contain an exhaustive or individualized history of
the applicant’s activities with the party. Accordingly, the BIA
made nary a mention of these dubious IJ findings. 
 
C.  Other Concerns
         Cuko aptly notes that the IJ also purported to base his
adverse credibility decision, in part, on “material inconsistencies
and discrepancies between the applicant’s written asylum
application and his testimony,” but then failed in the remainder of
his decision to cite any specific examples of such variances. 
Instead, the IJ based his entire credibility decision on the three
core discrepancies discussed above, and the BIA relied on only one
inconsistency. To the extent that the Cuko asylum application
suggests that he remained active in Democratic Party causes and
activities after the formal termination of his party membership in
November 2000, however, that allegation is coterminous with the
substance of his hearing testimony in this regard, and is not at
“variance” with his asylum application.
         If that were all the IJ meant by his reference to
“discrepancies between the applicant’s written asylum application
and his testimony,” it would seem that no prejudice would result to
Cuko. Yet we are left with no reliable guidance as to whether the
IJ relied on other purported “variances” which are neither
disclosed nor described in his decision. This unilluminated
reference inevitably undercuts overall confidence in the
reliability of the IJ’s credibility determination.
D.  Fear of Future Persecution
         Although the majority correctly concludes that the
country reports might have supported the IJ’s independent decision
anent Cuko’s lack of a well-founded fear of future persecution, the
IJ did not rely solely on these reports. Rather, he explicitly
states: “Even if this court were to take other sections of the
State Department report and responses in this record of proceedings
to contradict that Profile, this Court must note that the applicant
has been found to be not a credible witness, and therefore, this
Court cannot find that his testimony or the documents that he has
submitted are credible.” Because the IJ’s defective credibility
determination fatally infected his decision concerning the issue of
future persecution, we cannot affirm on that independent ground.
III.
         Finally, from a broader policy perspective, I would
suggest that this case is a prime example of what is so defective
with many immigration proceedings. While the IJ reasonably might
have accepted Cuko’s credibility arguendo, and then denied his
asylum application either on the ground that his ill treatment did
not rise to the level of “persecution,” or that the country reports
refuted his fear of any future persecution (indeed, we have
affirmed many IJ opinions to the effect that country conditions in
Albania have changed significantly), the IJ deliberately chose
silently to collect a catalog of perceived testimonial
discrepancies during the hearing, and then base his final decision
solely on Cuko’s lack of credibility. This may seem a relatively
insignificant and academic distinction, but to an asylum applicant,
it likely affects his sense that he has been given a fair
opportunity to state his case for asylum. He is removed to his
home country simply because he is a liar, and not because he has
not proven past persecution or a well-founded fear of future
persecution. Whether or not we agree about the specific facts of
the present case, I think it is incumbent on us to demand from the
agency a minimum threshold of fairness in the process. Expecting
that the IJ will afford an applicant a fair chance
contemporaneously to explain perceived discrepancies upon which the
IJ intends to base his adverse credibility determination is just
such a de minimis requirement. Zi Lin Chen v. Ashcroft, 362 F.3d
611, 618 (9th Cir. 2004). Short of that, our review function
becomes essentially meaningless.